Thomas *v.* Frauenthal.

4-5975 144 S. W. 2d 1054

Opinion delivered October 28, 1940.

*Elmer Schoggen* and *J. A. Watkins,* for appellant.

*R. W. Robins, Chas. B. Thweatt, Howard Cockrill* and *C. E. Johnson,* for appellee.

GRIFFIN SMITH, C. J. The decree questioned by this appeal modified a master's report relating to controversies between S. R. Thomas and the law firm of Frauenthal and Johnson.

Prior to November, 1927, Thomas was a successful business man and for many years had been represented

by the firm whose fees are alleged to have been excessive. Having prospered financially as distributor of Dodge automobiles, Thomas extended his business operations and became financially involved to such an extent that creditors grew apprehensive; and when habitual intoxication impaired his usefulness, he acquiesced in an arrangement whereby Bankers Trust Company and Union Trust Company were designated assignees charged with the two-fold duty of administering assets for the protection of creditors, and directing operation of the automobile business. It was hoped through this arrangement to liquidate Thomas' indebtedness and to return to him any surplus remaining after the obligations had been discharged.

As the result of a sanity hearing, Thomas was committed to State Hospital in Little Rock and remained there several months. He had previously received treatment at an institution in Illinois, where he was taken by Ector Johnson of the firm of Frauenthal and Johnson. During frequent periods of intoxication Thomas was arrested by peace officers and occasionally detained. Thomas alleged that the movement to procure his commitment to State Hospital was instituted by members of his immediate family. There is evidence that he was guilty of intermittent acts of violence extending over a long period of time, and that his conduct was such as to impress the attorneys with his mental incapacity.[1]

In appellees' cross-complaint it is stated that Thomas' indebtedness to Union Trust Company was $107,043.75, and that he owed Bankers Trust Company $107,400.

It is conceded by appellees that Frauenthal and Johnson were attorneys for Bankers Trust Company and were paid an annual retainer. They did not, however, represent Union Trust Company.

Suit against Frauenthal and Johnson and the two banks was brought in 1934 by Price Shofner, guardian.

[1] Where the term "appellant" is used in this opinion, it has reference to S. R. Thomas. "Appellees" include Jo Frauenthal, Administrator; Ector R. Johnson, Samuel Frauenthal, and John A. Sherrill.

When the guardian was discharged the cause was revived in the name of S. R. Thomas, who in the meantime had been adjudged competent. Judge Frauenthal died in December, 1935, and as to him the cause was prosecuted against Jo Frauenthal, administrator.

J. A. Sherrill, who was associated with Frauenthal and Johnson from May, 1929, to December, 1932, was made a defendant. There are numerous pleadings, including cross-complaints by Frauenthal and Johnson and Ector R. Johnson.[2] Appellees contend that valuable services not entered upon the firm's books were rendered Thomas; that compensation was due for attention given the Thomas interests while held in trust by the banks,

[2] In the complaint of Shofner, guardian, filed February 13, 1934, judgment for $26,140, with interest, was asked, "less a reasonable attorneys' fee for services of the defendants."

January 8, 1936, Thomas made showing that his disability had been removed March 3, 1934. The order was that the suit be revived in the name of S. R. Thomas. The death of Samuel Frauenthal having been suggested, the suit was revived against Jo Frauenthal, administrator. February 7, 1936, the administrator answered, denying liability on the demand of $26,105.57. May 18, 1936, an amendment to the complaint was filed, alleging collection by Frauenthal and Johnson of notes and accounts due the Schmand-Porbeck Company, amounting to $5,651.75, and failure of the law firm to account for proceeds. There was the further allegation that notes not connected with the Schmand-Porbeck transactions aggregating $2,234.26 were collected by Frauenthal and Johnson, and the proceeds unaccounted for. The prayer was for judgment against Union Trust Company, Bankers Trust Company, Ector R. Johnson, and Jo Frauenthal, administrator, for items aggregating $34,213.77.

Separate answer and cross-complaint of Frauenthal and Johnson and Ector R. Johnson was filed October 21, 1936. In the cross-complaint it was alleged that the Poinsett county road district claim was placed for collection on a 50 per cent. contingent fee basis. The assignment transaction involving the two banks was set out, with an allegation that there was an agreement for payment of $20,000, plus one-fourth of the estate salvaged. The prayer was that the court determine value of the residue and decree payment to cross-complainants upon the basis of their contract.

October 22, 1936, Jo Frauenthal, administrator, filed his motion to strike the amendment to the complaint. Contention was that no process had been served on the administrator in respect of the demand enumerated in the amendment, and that such demands did not pertain to the original cause of action.

The administrator's motion to make John A. Sherrill a defendant was granted.

Answer to the cross-complaint, being a general denial, was filed November 13, 1936.

December 29, 1936, Ector R. Johnson filed his separate and substituted answer and cross-complaint. It consists of 43 typewritten pages. In the answer 36 transactions, such as pleadings, orders, etc., in the road district case, were itemized, together with

and that agreements now denied by appellant as to fees were to have been evidenced by writings.

In the original complaint filed by Shofner it was alleged that in February, 1931, Frauenthal and Johnson collected from the state $52,211.14 and retained $26,105.57 as a fee; also, that shares of the capital stock of the S. R. Thomas Auto Company, Inc., pledged to the banks, had earned dividends, 80 per cent. of which should have been paid to appellant; that balances to the credit of the automobile company ranged from $40,000 to $50,000; that the bank controlled notes given by purchasers of automobiles amounting to $30,000 or $40,000; that these should have been collected and the proceeds, together with a substantial portion of the cash balances, applied in payment of dividends, 80 per cent. of which would have gone to appellant. Other matters are complained of, but in view of the fact that non-suits were taken as to the banks, they are not essential to this opinion other than to emphasize the contention that the pledged property was not administered as faithful trusteeship required.

*First.—Poinsett County Road Claim.*—Ector Johnson testified that when the item of $52,211.14 was col-

---

identification of 16 depositions. Twelve abstracts and briefs were alleged. There is a resume of work alleged to have been done in connection with the claim.

The cross-complaint first reviews the business status and personal characteristics of S. R. Thomas. There is recital of work done by the law firm and of financial transactions engaged in over a long period of years. The prayer was for judgment for $20,000, with interest from November 29, 1927, and for an accounting for one-fourth of the value of the salvaged estate of S. R. Thomas. There was this alternative prayer: "In the event the court should find that there was no contract for compensation [cross-complainant prays] that he have judgment for a reasonable amount on a contingent *quantum meruit* basis for the services performed."

January 15, 1937, in response to a motion to make the cross-complaint more definite and certain, there was an enumeration of 17 transactions.

January 21, 1937, Thomas moved that Johnson be required to make his substituted answer of January 15 more definite and certain, to which there was response February 26, 1937.

A second amendment to Thomas' complaint was filed March 9, 1937, in which it was alleged that Ector R. Johnson owed the S. R. Thomas Motor Company $5,659.60 for merchandise.

Answer to Johnson's cross-complaint was filed March 9, 1937.

An additional item claimed by Thomas relates to sale of certain property to E. E. Mitchell for $1,000. Collection was made by Johnson, who admitted receiving the money. Johnson contended the remittance was applied on expenses and as attorney's fee.

lected, he remitted $26,105.57 to Bankers Trust Company and retained $26,105.57 as the firm's fee. Appellant was not immediately informed the claim had been collected, and insists that it was merely by chance that the fact was ascertained.

In 1922 Peay & Jett undertook completion of a contract originally awarded A. Luck for construction of a highway from Harrisburg to Truman, in Poinsett county. Luck's undertaking was guaranteed by U. S. Fidelity & Guaranty Co. Having failed in an effort to sell trucks to Peay & Jett, Thomas entered into a contract with the firm to haul gravel, his compensation to be that received by Peay & Jett. When time for payment came, Thomas contended he had been led to believe there would be sufficient funds to compensate the work he had done. It developed, however, that the district had exhausted its resources. Unpaid federal aid was $10,000.

It was contended by appellee that Thomas was willing to accept $10,000 in settlement of his claim, although he had expended approximately $32,000. After considerable litigation it was determined that Thomas was entitled to $37,453.13. Johnson also insists that originally his firm was employed solely to collect the item of $10,000. A retainer of $500 was paid. The federal fund was deposited in a bank at Harrisburg. It failed in 1924, and Thomas did not receive anything from that source.

Thomas contended he was merely an employe and as such was entitled to protection under the bond executed to guarantee Luck's performance. This was denied, coupled with an allegation that he became principal, which would subject him to liability to the district and other claimants.

Johnson testified that Thomas informed him he would not advance any more money nor pay additional attorneys' fee, and that he (Johnson) replied: "Well, if that's the way you feel about it, I'll be willing to go ahead and represent you on a contingent basis of 50 per cent. of what is actually recovered. He agreed to do that; and, under that agreement I proceeded to work the matter out."

Johnson further testified that this agreement was made in Thomas' office in 1924. There was no written memorandum. No one else was present. Johnson says he agreed to pay all costs and expenses in connection with the collection. Thereafter, copies of contracts, bonds, specifications, and estimates were procured. from the highway department. A review was made of all work done by Luck, Peay & Jett, and Thomas. ˙ Luck, Peay & Jett, the district, and the U. S. F. & G. were named by Thomas in a suit for collection. Records were reconstructed. Only the bonding company was solvent, its contingent liability being $50,000. Peay & Jett had a written contract with Luck to assume the latter's obligations, to which the bonding company assented. When sued, Luck, in a cross-complaint, alleged that Thomas assumed all bills unpaid by Peay & Jett, and that Thomas was to look directly to the district for compensation. Altogether, 22 pleadings were filed. Thomas testified his agreement with Peay & Jett was verbal. He had formerly referred to a written contract with the firm. Peay, in his deposition, asserted there was a written contract, but it was not produced.

The cause was submitted to the chancellor, who in December, 1926, gave a memorandum opinion sustaining the contention that Thomas was entitled to recover from all defendants, but allowed only cost of the work ($23,-000) instead of $37,000, which would have been the amount due if the Luck contract had been used as a basis of computation. The finding was also against the U. S. F. & G. Before the decree proper was signed, counsel for those against whom the chancellor had indicated judgment would be rendered asked for appointment of a master, and the request was granted. November 28, 1929, the master made his report recommending judgment against the four defendants for $37,000, with interest at six per cent. from 1924. The following is copied from appellees' brief, and has reference to the testimony of Ector Johnson given in the case at bar:

"We prepared a decree in compliance with (the master's) report, which our adversaries objected to. In

the meantime—in the latter part of 1928—(and one of the reasons for delay before the master) there were negotiations in which we participated between attorneys throughout the state who represented clients having claims against road districts with a view to having the legislature pass a bill for the state to pay such debts."[3]

Appellees then review the history of the legislation referred to, emphasizing efforts expended when its constitutionality was attacked, and effectiveness of participation of the firm of Frauenthal and Johnson in conferences, trials, and appeals.[4]

June 6, 1930, John A. Sherrill, who had become a member of the firm of Frauenthal and Johnson, sent Bankers Trust Company a bill for $120.90 representing expenses incurred between December, 1929, and April, 1930.[5]

Johnson testified that although the bank paid this bill, and the amount was not refunded nor paid to Thomas, collection was through error, inasmuch as Sherrill was not familiar with the transaction, and:— "I explained the situation to him and no more bills were sent." Thereafter expenses of $1,500 or more were incurred and paid by the law firm.

*Second. — Miscellaneous Contentions.* — The answer and cross-complaint, considered as a whole, alleged that services had been rendered Thomas of the value of $50,-000 for which payment had not been received. These

---

[3] The legislation referred to is act 153 of 1929, which provides: "That the Highway Commission shall as soon as possible ascertain the amount of any valid outstanding indebtedness incurred prior to January 1st, 1927, against any road district in the state of Arkansas organized prior to the passage of act No. 11 of the Acts of the General Assembly of the State of Arkansas for the year 1927 which was approved February 4, 1927, and shall draw vouchers to be paid out of the appropriation already provided for in act No. 18 of the Forty-Seventh General Assembly for the payment of road district bonds and interest obligations."

[4] *Grable* v. *Bladewood*, 180 Ark. 311, 22 S. W. 2d 41; *Highway Commission* v. *Dodge*, 181 Ark. 539, 26 S. W. 2d 879; *Highway Commission* v. *Otis & Co.*, 182 Ark. 242, 31 S. W. 2d 427.

[5] Items comprising the total of $120.90 are: Clerk of Poinsett chancery court, $11.50; "expense" to Harrisburg, $44.70—for trip made December 1, 1929; "expense" to Harrisburg, December 10 and 11, $51; filing petition for mandamus in Pulaski chancery court, $7, and miscellaneous amounts of $6.70.

services were mostly in 1927 and 1928, but some extended to 1930. Even as late as 1934 services in connection with insurance policies were rendered.

The answer pleaded payment, and the statute of limitation. An expense item of $946.77 was allowed Frauenthal and Johnson, including a fee of $500 paid Owens & Ehrman for work done in connection with collection of the road claim.

Payment of $200 in 1924 to W. R. Haeglar was disallowed by the master because two settlements between Frauenthal and Johnson and S. R. Thomas had been made subsequent to that date. The Haeglar charge did not appear on appellees' books until 1931.

*Third. — The Cross-Complaint.* — Thomas testified positively that, although he only superficially examined the contract Johnson proposed in connection with liquidation matters and assignment to Bankers Trust Company and Union Trust Company, one of the items was $5,000 for services in the road case. When asked if he was absolutely certain of this he replied: "Yes, sir—because that was the most important suit we had—that was the most important unfinished business that we had any hopes of getting any money out of."

Appellant was the owner of $2,000 of the capital stock of Schmand-Porbeck Candy Company. The corporation became financially involved. In consideration of additional stock appellant, in 1927, indorsed the company's notes for $119,500. In July of the same year an audit showed operating losses for the preceding six months were more than $22,000. It is contended on behalf of Frauenthal and Johnson that they, knowing of other large obligations due by Thomas, became apprehensive. Following discussions with Thomas it was decided that an itemized statement of his assets and liabilities should be prepared. The result showed assets of $627,000 and liabilities of $578,000. There were additional assets aggregating $107,000, consisting of Schmand-Porbeck stock, and other stocks, which appellees state they considered worthless. Current liabilities amounted to $368,000. Appellant had become president

of Commonwealth Life Insurance Company and Commonwealth Accident Insurance Company. Both were in financial difficulties. The insurance commissioner was threatening suit against Thomas for an asserted liability of $80,000.

In their brief this statement appears: "Appellees conceived the idea that it might be possible to induce [Bankers Trust Company and Union Trust Company] to act as trustees for Mr. Thomas and to assist in working out an orderly liquidation." Whether the suggestion for appointment of trustees came from the banks, from the law firm, or in consequence of conversations between the attorneys and Thomas, is not clear. Appellees maintain that after procuring appellant's agreement they took the matter up with the banks "and prevailed upon them to agree to accept such an assignment and to act as trustee in an endeavor to orderly liquidate the indebtedness."

It was contended that compensation for the services to be performed by appellees was thoroughly discussed. It was urged that "Because payment of a large fee in cash would handicap the prospects of getting the banks to advance additional moneys with which to compromise, settle, or pay off other indebtedness, it was agreed that the fee would be second and subordinate to, and the advances by, the banks."

Ector Johnson, on behalf of appellees, testified it was first agreed that the firm's fee would be one-half of any amount saved to Thomas through the liquidating process, but "later it seemed advisable to specify a definite part of the fee to be payable in cash so as to place the appellees in better position to collect a part of the compensation due them for their services rendered in the matter in event of bankruptcy." Thereupon, the fee was changed to the fixed sum of $20,000, plus one-fourth of salvage. Written contract was prepared embodying these conditions, and notes for $20,000 were written.

According to Johnson's testimony, Thomas objected to signing the notes. It was then agreed the fee would

be $20,000, plus 25 per cent. of salvage, but the definite item would not be evidenced by notes. A substituted contract was prepared. In their brief appellees say: "Both appellant and his brother, H. C. Thomas, admitted seeing such a document, but stated that the items contained in it were not the same."

In 1928 appellant purchased all assets of Schmand-Porbeck Company. Notes and accounts due the corporation were turned over to appellees for collection. Appellant testified that in March, 1934, he attempted to procure information from Johnson regarding collections made on the candy company assets, but was not successful. He then employed an accountant and directed him to make an audit. It was found that collections had been placed with The Adjustment Bureau. There is testimony that the bureau was incorporated in 1928 by D. D. Panich, Ector Johnson, and A. W. Taylor, and that it continued to collect the Schmand-Porbeck accounts until July or August, 1929, when Panich and Johnson sold their stock to Taylor. In the record before us it is stipulated The Adjustment Bureau collected accounts due the Schmand-Porbeck Company, under employment by Frauenthal and Johnson, amounting to $4,371.25. After the bureau's fees of $907.91 had been deducted, the difference of $3,463.34 was received by the law firm, of which $580.34 was accounted for. Liability of $2,883 was admitted. There is this statement: "This stipulation does not include the additional sum of $1,468.26 alleged to have been collected by The Adjustment Bureau and not accounted for by it to Frauenthal and Johnson." The stipulation was not joined in by Jo Frauenthal, administrator, or by John A. Sherrill.

Included in the assets covered by the Thomas assignment were life insurance policies amounting to $138,000, with large loan or cash surrender values.

The controversy was referred to S. S. Jefferies, master, who found there was no agreement between Thomas and the law firm of Frauenthal and Johnson for a contingent fee either in the road district matter, or in the assignment transaction. He held that a fair fee, on

the basis of service for making collection from the highway department and for work performed in reducing the account to liquidated form, was $15,000.

In holding that $15,000 was allowable for making the road collection, the master said: "I realize that a $15,000 fee is rather large, but this was a peculiar case, as I have heretofore outlined, and extended over a long period of years with the results somewhat in doubt, although I cannot understand from the evidence in the case why the case was not prosecuted more diligently against United States Fidelity & Guaranty Company."

There was reference in the master's report to Johnson's testimony that cost in the case amounted to $2,500. He thought this was mere surmise. Costs and expenses were allowed in the aggregate sum of $946.77. Payment of $500 made by Thomas as a retainer was deducted from $15,946.77, leaving a net allowance of $15,446.77. Judgment for Thomas against Frauenthal, administrator, and against Johnson and John A. Sherrill, for $10,658.80, with interest from February 22, 1931, was recommended.

The special chancellor, in his findings of facts and declarations of law, allowed the expense item of $946.77, but also allowed $200 claimed by Johnson to have been paid W. R. Haeglar. In his comment the master said: "I am disallowing the $200 fee claimed by W. R. Haeglar, for I am of the opinion same has been paid. This payment was evidently made in the early part of 1924, and Frauenthal and Johnson have had two settlements with S. R. Thomas since that date." The chancellor also found that $20,000, instead of $15,000, would be a fair fee for services rendered by the law firm in connection with the road case.

After identifying claims set up in the cross-complaint and making three distinct classifications, and mentioning the proposed contract as evidenced by unsigned copy found in Frauenthal and Johnson's files as identified by Clyde Brewer, secretary for appellees, the chancellor said: "Thomas had an opportunity to sign the agreement. He was requested more than once to sign it

and he refused. The burden is on the defendants to prove an assent to this agreement. I do not think the evidence is sufficient to sustain such an agreement. The fee must be fixed on a *quantum meruit* basis.''

It was found that under management of the trusts (according to a financial statement of May 12, 1937) Thomas would have insurance policies with a present loan value of $22,595, 800 shares of stock of the S. R. Thomas Auto Company, and certain other assets. Concerning values the chancellor said: ''Reduced to reality, this statement indicates rather clearly that on final liquidation Thomas will probably have left the insurance . . . and the 800 shares of stock.''

There was this further comment by the chancellor: ''When we visualize the services Frauenthal and Johnson were called on to render in an attempt to serve S. R. Thomas, beginning with the cases set out in the cross-complaint first in point of time and follow the history of the cases as they progressed, one by one as proven by competent testimony, an unprejudiced mind gets a picture of a most difficult situation—one calling for long hours of labor, seasoned judgment, and willingness to accept responsibility. . . . I cannot conceive of a more difficult problem confronting a lawyer. If the fee could be fixed on the basis of actual services, it would be greater than the court finds it possible to allow in this case, for the reason that the court is of the opinion that the salvage value of the Thomas estate does not justify a fee in excess of $20,000.''

An item of expense amounting to $377.30 was allowed.

The master found that after November 29, 1927, the trustees were proper parties to employ attorneys. He also found that $1,000 was paid Frauenthal and Johnson by Bankers Trust Company September 8, 1928; $1,000 by Union Trust Company, and that an additional payment of $500 was made by Bankers Trust Company November 10, 1933, in payment of services rendered in connection with the assignment. In addition, the so-called

"Mitchell check" for $1,000 was found to have been received by Johnson and not to have been transmitted to Thomas. The bank payments of $2,500 and the Mitchell item of $1,000 were charged to Frauenthal and Johnson by the master. The chancellor approved the recommendation.

The master's finding that Frauenthal and Johnson had collected $2,829.74 in notes and accounts due the Schmand-Porbeck Company, and had not accounted, was approved by the chancellor. A disputed difference of $1,468.28 admittedly collected by The Adjustment Bureau, receipt of which was denied by Johnson, was allowed by the master.

Collections of $1,468.26 admittedly made by The Adjustment Bureau (receipt of which was denied by Johnson) were found by the master to be due Thomas, less commission of 25 per cent., leaving a net balance of $1,101.20, for which credit in favor of Thomas was recommended. Of the Schmand-Porbeck collections so made, only $228.39 came to the law firm after Sherrill joined it. The master's finding of liability on the net item of $1,101.20 is explained in the following statement: "Where accounts are turned over to a firm of lawyers for collection, and the firm of lawyers selects an agent to make the collections, and the collections are made and unaccounted for by the agent, the firm of lawyers is liable to the client for the collections. This would especially be true where a member of the firm of lawyers is interested and part owner in the agency that makes the collections." The chancellor held otherwise, and disallowed the item.

Regarding appellees' plea of the statute of limitation, the chancellor said: "I adopt the language of Mr. Thweatt [of counsel for appellees] in his memorandum brief when he states: 'Regardless of whether the minds of the parties met as to the amount of the fee, the evidence is conclusive that there was one general contract of employment to handle the entire liquidation, and that the fee was subordinated to the debt to the banks and to advances to be made by the banks to pay other debts

of Mr. Thomas'. On this basis, there is no place for the application of the statute."

As presented in the briefs the case appears highly involved. The ramifications are many, and an extraordinary amount of work was done. Frauenthal and Johnson handled more than 100 cases for Thomas. It would be a work of supererogation here to review even the more substantial acts of representation to which proof has been directed. Appellees' exceptions to the master's report consist of 52 numbered paragraphs.

Appellant's exceptions are to the finding that the Mitchell check, although received by Frauenthal and Johnson, was applied on his fees due by appellant, and to the further finding that the law firm should receive only $10,658.80 from half of the road claim. We must assume, therefore, that in all other respects appellant is satisfied with the report.

It was stipulated that the personal account of Ector Johnson to the S. R. Thomas Auto Company might be treated as an indebtedness due S. R. Thomas individually, and that any amount so found to be due should be offset against any amount found to be due Johnson, etc. The chancellor found that the amount of the account was not in dispute, and that "it was certainly payable in 1934."

On the highway collection the master recommended that interest be charged from February 22, 1931. The chancellor held that when the collection was made in 1931, Frauenthal and Johnson had been in the employ of Thomas for the preceding four years; that the services continued until February 13, 1934, at which time relations were definitely severed by the action of Shofner in filing complaint; that accounts were unliquidated, "and being so, no interest can be charged against either party." [6]

## OTHER FACTS—AND OPINION.

Frauenthal and Johnson had for many years been the retained attorneys for Bankers Trust Company. Frau-

[6] *Carter* v. *Bartholomew Road Improvement District*, 156 Ark. 413, 246 S. W. 470.

enthal was a director. Thomas had served as a director for a short period.

For consultation and advice, Frauenthal and Johnson were paid $2,000 in 1926. For 1927 and several years thereafter they were paid $3,000 annually.

In commenting upon the genesis of the assignment creating a trusteeship, the master said: "I am convinced that the idea . . . originated in the minds of officers of Bankers Trust Company and Union Trust Company, and of H. C. Thomas, brother of S. R. Thomas, who was managing the S. R. Thomas Auto Company, Inc., upon information and advice given by Frauenthal and Johnson from facts obtained by them of the heavy obligations incurred by S. R. Thomas, as shown by the audit of Schmand-Porbeck Candy Company. I arrive at this conclusion from the evidence of A. Brizzolara, Jr., vice-president of Union Trust Company, who testified that the idea of the trust agreement probably originated with the two banks, due to the fact that S. R. Thomas was indebted to the two banks in a large amount and apparently had assets that were ample to pay, provided they were worked out over a period of time; and from the fact that C. E. Crossland, vice-president of Bankers Trust Company, assembled and collected the information composing the many items of assets belonging to S. R. Thomas and appraised the value of the same; also to the fact that H. C. Thomas furnished the information necessary to compile the assets of S. R. Thomas, and to the fact that Frauenthal and Johnson, being attorneys for Bankers Trust Company, owed a duty to the Bankers Trust Company to protect it under the circumstances."

There was the further consideration, given weight by the master, that Thomas was ill; that he testified he did not originate the plan, and that he signed the agreement upon advice of his brother, and upon the advice of his personal friend, Ector Johnson.

It is obvious that the spectre of bankruptcy was present. Frauenthal and Johnson were under duties alike to two clients. If S. R. Thomas had been mentally able to entirely comprehend the relationship between mem-

bers of the law firm and Bankers Trust Company, and could have appraised the fact of dual obligation, and if the conflict of interest had not been such as to cause a cleavage to one and abandonment of the other, there could be no objection by Thomas to the fact that his own attorneys—at least one of whom was a personal friend—represented Bankers Trust Company. It is conceivable (and we think in reality that attitude was present) that Frauenthal and Johnson regarded the trusteeship as essential to the well-being of Thomas' continued business existence. Their judgment in this respect was not erroneous. They had a right, with knowledge by Thomas of their obligations to Bankers Trust Company and appreciation by him of the relationship, to suggest the assignment and urge its consummation. So long as understanding of the status existed, and a conflict of interest did not occur, there was no transgression by Frauenthal and Johnson of the standard of legal ethics which essentially must exist.

We think it clear that at the time the transactions were being conceived, and while they were in process of administration, there was no purpose by Frauenthal and Johnson, or by John A. Sherrill, to deviate from a policy of professional rectitude which would meet the most exacting scrutiny. It is true that proposal of the attorneys was that they should receive a fee of $20,000 from salvaged assets of the Thomas interests, and 25 per cent. of the final values; but the master and the chancellor both found that the suggestion was not accepted. The trustees were informed of the proposal for such fee.

The vice occurs, we think—not in the transactions involving creation of the trust and its administration—but in the construction now attempted to be given these relationships. Johnson insists, as evidence of services, that Thomas was mentally incapacitated, and therefore incapable of handling his business affairs. This conception of the client's capacity undoubtedly did not exist to the extent alleged; otherwise validity of a contract of employment would not now be urged, the terms of which, if enforced, would strip Thomas of all the property it was the purpose of the interested parties to conserve for

payment of debts and as a residue for the debtor. We must assume, therefore, that present instincts of self-preservation, a lapse of time, and the intervention of multifarious duties unrelated to the controversy here presented have unconsciously influenced appellees in urging a construction which if existent when the transactions were current would have required the abandonment of one client or the other.

We must assume that if Frauenthal and Johnson, in 1927, regarded the unsigned proposal as evidencing their oral contract, the attorneys would have informed Bankers Trust Company of the dual relationship. We must further assume that if the attorneys were cognizant of appellant's mental condition they must also have understood that he was not competent to weigh the inconsistent relationship created when Bankers Trust Company paid fees from their own funds for retained representation, and at the same time made payments from trust funds.

Specifically, the written contract appellees insist was agreed to, but not signed, affirmed retention of Frauenthal and Johnson in all suits and matters "involving or against me relative to the Commonwealth Life Insurance Company and the Commonwealth Accident Insurance Company, and for a portion of their fee as attorneys I hereby agree to pay them the sum of $5,000, and in addition to said portion of said fee I hereby agree to pay them an additional sum as hereinafter set forth." There were similar clauses respecting services relating to the Schmand-Porbeck Company.

The third item of employment reads: "I have also employed Frauenthal and Johnson as my attorneys to attend to all claims and matters against me held by the Union Trust Company." The partial fee expressed was $5,000. To the same effect was item four, wherein the attorneys were to represent Thomas in "all claims and matters against me held by the Bankers Trust Company." The partial fee, as in the three preceding paragraphs, was $5,000, "and the additional fee as hereinafter set forth."

Paragraph six was a covenant to pay a further fee of 25 per cent. of final recovery values after other debts had been paid, ". . . for their counsel and services as such attorneys, to me, in liquidating all the debts and claims against me."

For the reasons here expressed, it is apparent that payment by the banks, accepted after Thomas had declined to commit himself to Frauenthal and Johnson, was in fact payment for handling matters pertaining to the trusteeship.

Three matters not settled for were being handled for Thomas by Frauenthal and Johnson at the time the trust agreement was executed:

(1) The so-called Caldwell matter. Johnson testified that his fee and expenses had not been compensated. Thomas insisted the transaction had been closed; that the attorneys received stock for their fee, and that in addition they collected $2,000 in October, 1927. The cross-complaint was filed October 21, 1936—nine years after payment is alleged by Thomas. The master held the claim was barred by limitation.

(2) In the Schmand-Porbeck Candy Company Case the attorneys received through a court order $1,000. In addition, as the master expresses it, "Mr. Johnson persuaded the receiver . . . to give him $2,425, which was one-half of the allowance made for the receiver in the case."

(3) The Commonwealth Insurance Company Case was pending when the trust agreement was made. The master's report recited that there had been considerable conversation about it, but suit was not brought until after the trust agreement had been effectuated. Says the master: "It is my opinion that the Bankers Trust Company and the Union Trust Company were parties to the suit, that they furnished the money in settling the suit, and there is no liability on the part of S. R. Thomas, for the reason that compensation for the attorneys . . . has been paid by the trustees, and for the further reason that the claim has long since been barred by the statute of limitations."

Summarizing the master's report in respect of matters other than the road claim, we find:

(1) Because there was a settlement between the attorneys and Thomas in 1926 with payment of $2,000 by Thomas October 25, 1927, the Caldwell claim, if any part remained unpaid, was barred by limitation.

(2) Certain other items set out in the cross-complaint have either been paid, or are barred.

(3) The Schmand-Porbeck employment arose before execution of the assignment. The attorneys received $1,000 from the court and "persuaded" the receiver to pay an additional $2,425, representing half of the receiver's fee. Any compensation should have been paid by the trustees. Assets of Schmand-Porbeck were sold by the receiver early in 1928 and were bought by Bankers Trust Company, thereby becoming part of the assigned estate. Johnson stipulated that he owed $2,883 arising from collections and remitted to his firm. Neither the administrator nor Sherrill concurred in this stipulation. Additional collections of $1,101.20 realized from Schmand-Porbeck assets were collected by or are chargeable to Frauenthal and Johnson.

(4) Of the $2,883 not accounted for by Frauenthal and Johnson, $228.39 was collected while Sherrill was a member of the firm, but none of the $1,101.20 was so received.

Viewing the history of all transactions, considering settlement customs prior to 1927, and taking into account relationships which are shown to have existed, the master did not err in the exclusion of items antedating the check for $2,000 given October 25, 1927; nor do we think he was mistaken in holding that certain payments had been made, in consequence of which the cross-complaint was dismissed.

This leaves for consideration Schmand-Porbeck collections and Ector Johnson's personal account with the automobile company. Also, there is the question of interest.

Judgment will go against Frauenthal, administrator, and against Ector Johnson and John A. Sherrill for

$10,658.80 representing excess charges on collection of the road claim, our holding being that a fee of $15,000 was sufficient.

Other judgments will be:

Against Frauenthal, administrator, and Ector Johnson and John A. Sherrill, for $228.39.

Against Frauenthal, administrator, and Ector Johnson, for $3,984.24 covering Schmand-Porbeck items of $2,883 plus $1,101.20, subject to reduction by $228.39 when judgment for a like amount here given against Frauenthal, administrator, and Ector Johnson and John A. Sherrill, has been paid.

Against Ector Johnson for $5,659.60, covering personal automobile account.

The most difficult problem is that of interest. While there was no authority upon the part of appellees to arbitrarily appropriate fees, and while overcharge on the highway collection occurred in 1931, Thomas' testimony is that he mildly protested soon after the transaction came to his attention, and said: "I think you have overcharged me in this road case and we are going to have to have a friendly lawsuit about it. . . . We will be good friends, and just thresh it out as good friends."

We think that in view of all the circumstances, and the fact that appellant continued to carry Johnson's personal automobile account until suit was filed, there were reservations in appellant's mind in respect of a general settlement. Therefore, interest should run from February 13, 1934, when suit was filed.

The cause is reversed, with directions to enter judgments conforming to this opinion.

Mr. Justice McHaney thinks the preponderance of the evidence establishes a contract in the Poinsett county road matter for a 50 per cent. contingent fee, and to that extent dissents.